Please refer to the podium or speak from the stage. We have people sitting at the table, that's usually when they're disabled. Is there anything at the outset that the justices did not need to discuss? I should say, issue number 6 that we raised in our brief was now moved. In the Rule 305B proceeding regarding the adequacy of the appeals security, Judge Anderson wrote a little bit more about pre-judgment interest. We're not returning that issue. Thank you. Thank you. Our presentation is going to be in two parts. As the court members know, we are asking you to vacate the judgment that was entered November 2, 2016 by the Will County Circuit Court. We're asking you to do so as a matter of law, based upon a lack, one, of consideration of the document that Mr. Conrad recorded. Two, that that document secondarily could never serve as a valid ovation. Let's talk about the Conrad document in the first place. That was identified at trial as plaintiff's exhibit 43, which was admitted. It was recorded with the Will County recorder January of 2013. The agreement on page 2 has mutual promises. One, as Mr. Conrad said, on supposedly July 14, 2000, which is the date of this document. And please understand, my arguments take the document at its face for the sake of argument only, because we believe that this is a vacated fortune. And I'll cover that in section 2 of the presentation. On page 2, Mr. Conrad maintains he has agreed to assign his 50% interest in exchange for the payments as described. What we do know, as undisputed fact in this case, is that Mr. Conrad on July 12 had done two significant things, which we believe required a revision of the judgment. One, Mr. Conrad assigned his entire interest to whatever development right that he possessed, in writing, without doubt, admitting at trial, the moment I signed the assignment, I knew I would not have an interest left in this property. He signed it. He was the first assignment in the string of assignments necessary for my client to take what had been an option to purchase land, owned by Mr. Conrad, and Huntley Building Development Corporation, controlled by his longtime business partner, Mr. Canopic, to assign that purchase right option to allow my client, in the end, to be the buyer from the EJ&E Railroad of 168 acres. Now, in this appeal, don't you have a problem with the trial court's findings that Dubas' testimony was not credible? A problem only in that my job is to show you, based on manifest weight, that such credibility finding was incorrect. Either it's arbitrary or not, based on the evidence. We have done so in briefs. The argument I'm talking about right now is a matter of law. Well, I understand that, but I wanted to raise this. Okay, so I know you're arguing something different, but I want you to address this point because this is a record on appeal. We give deference to trial court's findings under the law. We give them standard of review. And the judges' findings were very direct. You don't always see that, but this is a very direct finding that someone's not credible. Right? We'd love to talk about that. Do you want to continue on with your argument because you're really arguing the basic procedure of this case? As you understand it, that there was a statement by your client that no longer did he have an interest in the property back in 2000? Is that what you're talking about? No, I'm talking about Mr. Conrad, my client's opponent, who recorded the document. Yeah, right, okay, fine. You're talking back in 2000, right? Exactly. All right, continue on with that. There can be no valid contract for Mr. Conrad to receive anything because with mutual promises, and those mutual promises being the only consideration, those promises have to be binding on both parties in order to be valid and to consist of consideration. We studied the Armstrong Paint and Varnish Works case for the proposition that as a matter of law, if you compare the facts to the case, Mr. Conrad had nothing binding to offer two days after he had already made his assignment. So Mr. Conrad's judgment was based upon Exhibit 43, the document he recorded. If this is not a valid contract, and we, I believe in some view it is not as a matter of law, using Penovo standards with no deference to the trial court, if it's not a contract and it's not enforceable, Mr. Conrad could never win. That's why you should vacate the judgment in this case. Mr. Conrad had already assigned a witness. Two days after the fact, if you take this document on fixed value, he has nothing left to sell. And how the trial court got to where it got, we raised it in post-trial motion to avoid having to come here first. Using the post-trial motion procedure for witness work, show the court where the errors lie, give the court a chance to correct them before coming to this court after a bench trial. Secondary, this document could never serve as a valid motivation. Number one, there's no consideration for it, but secondarily I want to cover the second point, which is it can't be a novation if the parties to the new contract are not in agreement. My client could never have agreed to pay an additional $288,000 for an interest they'd already had. Mr. Conrad, as a matter of undisputed fact, was a registered manager of my client at the time of relevance, July the 12th of 2000 through July the 17th of 2000, and that's an undisputed fact. He was the organizer of the company in 1999. He served as its registered manager until the year 2002. He had fiduciary duties as a registered manager to my client, and insisting that my client pay an additional $288,000 for something they'd already had is certainly a breach of any fiduciary duties. Plus you have issues of self-interest. Mr. Kanaka, named as a member manager in the operating agreement, and Mr. Conrad as a registered manager were both prohibited by the operating agreement from related party transactions. It had to be an arm's length commercial transaction between the company and any person wanting to do business with it. Related party transactions were prohibited. If you're a manager of the company, you can't transact with the company unless it's at arm's length. This is certainly not an arm's length transaction. This isn't a suit against Conrad or Konopty, though, is it? Or a breach of fiduciary duties? It is not, but it illustrates to the court, based upon the operating agreement, the plain language which is taken in and of itself as a contract, what the two registered managers could not do, and that is enter into something like the exhibit 43, if you take it again at face value. So, it fails as a contract or a lack of consideration as a matter of law. It fails as an ovation as a matter of law. And for those two reasons, based upon the noble review, the judgment for Mr. Conrad should be vindicated. So, I'd also now like to move into some of the more, the manifest weight issues which I believe we have shown, based on agreement, based on the evidence, and the record on appeal, that the trial court's finding on various points was arbitrary, unreasonable, and not based upon the evidence. We believe the record is clear and convincing that Mr. Conrad created a backdated forgery sometime on or after December the 27th of 2011. Now, the post-trial motion made a very strong finding, which is the trial court found no credible evidence whatsoever of forgery. But I would ask the justices this. Short of Mr. Conrad's confession in the middle of the trial, aren't his own words that he admits, that he wrote at various points in time, objective evidence that is certainly credible to prove somebody's state of mind? There are acts and activities that would allow us to demonstrate quite clearly this Exhibit 43 is not what it professes to be. It was backdated. So let's talk first about the email series between Mr. Kanaka and Mr. Conrad. Beginning December the 19th, 2011, more than 11 years after the fact. If Mr. Conrad's document dated July the 14th of 2000 was real, this email series would not exist. There would be no reason for these men to be writing what they were writing. In December of 2000, it begins. Mr. Kanaka, on the 21st, says, Did you get a chance to review the agreement? What makes the trial court's decision-making very difficult to understand is the in-trial ruling that we received based upon Mr. Conrad's deposition, given the case, that the Shestey letter referred to specifically in this email series. So on Exhibit 28, admitted at trial, the subject line is Ray, Shestey letter attached. Mr. Conrad admitted that the attachment in the Shestey letter was what I showed him in the deposition as Common Area Exhibit 11, which was the personal agreement between him and Mr. Kanaka that the Shestey and Fraley lawyers had written with. That is the Shestey letter. The Shestey letter is the personal agreement that we know, based upon Trial Exhibit 3, which is admitted in the record. This is a fully executed agreement on July 12, 2000, between Mr. Kanaka and Mr. Conrad as individuals. Counsel has two minutes. Thank you. Those individuals reached an agreement that did essentially everything contrary to what Exhibit 43 professes to allow somebody to do. Mr. Kanaka agreed personally to pay Mr. Conrad the $208,000 himself. Mr. Conrad admitted, or he denied in his deposition, ever knowing a thing about the July 12, 2000 agreement, personally between the two men. They agreed that no recording could be made against title. They actually had the series in which Mr. Kanaka would be paying Mr. Conrad. How is this not critical evidence? This email series has Mr. Conrad saying, in his own words, admittedly a trial, this was Roger not wanting me to pay $350,000. So this is how you and I handled the difference. 2011. Last point. Credibility. The court members conceded quite clearly. Mr. Conrad subverted the discovery process in this case, swearing to tell the truth meant nothing to him. In interrogatory answer, in request for production certification, in deposition, where he swore he'd never seen the agreement before, knew nothing about my client's operating agreement until the deposition was taken in 2014, I impeached him nine different times at trial. The trial court's finding that Mr. Conrad was credible is against the manifesto. It is certainly unreasonable, or arbitrary, or at least against the evidence, based on all the impeachments and everything else shown. Mr. Duva, the problem with the trial court's sharp finding as Your Honor has mentioned, there is nothing about Mr. Duva's testimony that the trial court can identify that says this was incredible, this was a lie, this was this, this was that. It was a blanket statement, but it identifies nothing. I pointed it out in the post-trial motion. There was no identification of anything that he took issue with. So if you compare impeachments of Conrad many, many, many times, undeniably, versus Duva's testimony about various things that nobody criticized, as untruthful, that the court has said, oh no, this is the reason why he's not credible, I know I'll have rebuttal time, but thank you very much. Thank you, Counsel. Counsel, you may proceed. If you could please report, Counsel. Ron Danachek, on behalf of John Conrad, with me today as co-counsel is Jim McConnell, who is also trial counsel in the case. Justice Carter, as you pointed out, this case is all about credibility. Judge Anderson may carry explicit findings as to the credibility of the witnesses, that there is a substantial basis in the record for those, but as this court knows, Judge Anderson was in the best position to evaluate the credibility of the witnesses, and his findings are entitled to great deference. This is not a case that turns on a question of law, as counsel would have me believe. The issue of a novation under Illinois law specifically provides that you can modify a contract like you can modify any contract. In the case of a novation, what you need is a change in the consideration, a change in the terms, a change in the parties, and that is exactly what happened here, because you start out with a personal agreement between Peter Danachek and John Conrad, and you shift to a corporate agreement, which has different parties, different payment timing, different right to record the document, and all of those factors are valid consideration, questions for Judge Anderson to consider on the credibility of the witness as to what was happening, but there clearly is no legal prohibition on a novation here, because Cresthill, who is saying, oh, we fully perform, we have an assignment of this contract right, wasn't even a party to the agreement, and that assignment was a deposit in an escrow, which was not disbursed on July 12, 2000, when the deposit was made, and although Cresthill is essentially saying, well, we did all we had to do by July 12, the closing doesn't occur until July 17, and this novation occurs in the interim on July 14, before there had been full performance of the contract, before there had been any breach of the contract, and in fact, there couldn't have been full performance, because performance was not just $142,000, it was a total of $350,000, with a substantial portion to be coming later down the track. This is precisely a circumstance where a novation is appropriate, because we start out with a situation where... You said 208,000 was coming later. 208,000, correct. It was $142,000 up front, $208,000 down the road, and the timing of that $208,000 also gets shifted between July 12 and July 18, in terms of being shifted to a period of under 60, when the property... I'm sorry, when Cresthill had less than 60 acres, was the new term, as compared to essentially a pay, as funds are available from various closings along the way. And Cresthill was the one paying the $208,000 under the novation. That's correct. And that also is consistent with the original letter of intent. There was a letter of intent here back in April 2012, which said that the entire payment was supposed to be at expense of the project, which is not an expense of Mr. Konopka personally, and Mr. Konopka, as a member slash manager, does not have an obligation to make this his personal expense, and so his decision to say, oh, this should be an expense of the project, or coming out of the project, is consistent with the letter of intent, doesn't violate any duties that he has to this entity. But even if there was a question as to what Mr. Konopka's duties were under the operating agreement, the operating agreement is July 12, 2000, signed by Duba as a member, signed by Konopka as a member, and signed by Konopka as the manager of the project. So on July 12, 2000, there is an agreement in place, which does not include Conrad, because Conrad is out of it at that point, because the new operating agreement, signed in effect between the parties, says Konopka is the manager, Konopka and Duba are the only members. At that point, Conrad is not a party, the testimony was that he had not seen the operating agreement, but we do know that Konopka, as manager, signed $2,500,000 worth of loan documents on behalf of Crestville, and Mr. Duba's signature appears on those same documents. And this whole argument about registration, well, Conrad was a registered manager of this, in the records of the Secretary of State, until a year later, that's got nothing to do with the parties. That's noticed to the world, but that's between the parties. They all knew, Conrad was out. It's like if two parties sign a deed, but it doesn't get recorded for a year later, that deed is effective on day one, between those parties. They were waiting a year, the 60 acres went up, I think. The 60 acres, that's something different. The 60 acres, that's the kicker for Conrad to be able to, actually it's an obligation for Crestville, once they get below 60 acres, Conrad has not been paid to record Conrad's July 14th agreement, and Conrad has the right to record the agreement on his own at that time, and that's the time when he should have been paid out. So the registration is really just sort of a ministerial thing, which just didn't get done on time. We also have this issue raised as to the credibility of the witnesses, and what was happening here. We have an affidavit from John Sinatra, as the manager of Crestville, who says, I was the manager, I signed this agreement on July 14th, 2000, and this is the agreement between us. That affidavit was introduced into evidence by Crestville. Mr. Sinatra was not called as a witness by either party. There was certainly no need for Conrad to call him because Sinatra in the affidavit says, this is the document, this is the agreement. If Crestville wanted to refute that testimony, they certainly could have called him, but right now, we have undisputed testimony from a third party, not Conrad or Duva, saying the July 14th document is the agreement. Did Konopka have the authority for Crestville to sign the agreement? Well, Konopka was the manager of Crestville, so he clearly had authority as manager for Crestville to sign documents. He signed all the loan documents for Crestville. Duva co-signed those documents. The issue that's raised is whether Konopka is violating some duty, acting outside the scope of his authority in signing this because he's somehow self-feeling or something of that nature. I think there are two points in that. First, Conrad is not a party to that operating agreement. What he sees is Konopka in the letter that the intent was indicated to be the manager, Konopka, Konopka understands him to be the manager with the authority to sign this. He had not seen the operating agreement, so he would not have known of any limitations. As to the limitations when they raise the issue of self-feeling, I have to take you back to the letter of intent, which says, this is an expense of the project, and there is nothing in that operating agreement which says Konopka's got to pay $350,000. This is an issue with Crestville or Duva suing Konopka for breach of fiduciary duties. That's correct. That was not a part of this lawsuit. There was no challenge. Instead, that was an argument in advance that says, Conrad, this agreement is effective because he breached the fiduciary duties, but you're right, there was not an action here to say there was a breach of fiduciary duty. Instead, it really goes to credibility. What Conrad understood, what he did at the time, and Council points out these email communications back in 2011, there was no testimony from Conrad that he actually opened up that attachment, saw that July 12th exhibit. Instead, the testimony from Conrad was that there was a typographical error, that instead of July 12th, it should have been July 14th. That's a question of fact, a question of credibility. We certainly know that there were some things done on July 12th. There were all these documents deposited into escrow. So, you know, could he have been confused at the time? Could he have been thinking back to that date rather than two days later when the July 14th date? We do know from those emails that Conrad also says that I have the right to report this document. I can just report this document. And that's in those December 11th emails as to how he's going to protect his interests. Rather than remoralizing, changing something, he says, I'll just report the document. The July 12th agreement had no right to report. It actually said, you can't report this document. The July 14th agreement says, you can report this document when you get that 60 acre mark. So we have Conrad not having testified in the ACA attachment in December 11th, but he knew that he had a right to report. And that could only come from that July 14th agreement. On the other side of this, we have Judge Anderson's findings that Cuba was not a credible witness. And we look at that in the context of the case. We have him say, I fully performed my obligations under this agreement. Not a party agreement. No money paid at that time. It's not closed until later. And it's only partial performance. We also have him challenging the fact that there's an operating agreement with Kanaka as what he calls the self-appointed manager. Well, it was clear from that letter of intent back in April that Kanaka was the manager. And that is what is reflected in the signed operating agreement and the signed loan documents, which Duba signs right next to Kanaka as a member. We have this argument about... Duba and Kanaka all signed those notes, right? Well, the note technically and the loan documents technically are signed by Cresthill, by Kanaka as manager, but Duba also signs as a member. There is a member signature on the loan documents. We also have this scheme. Member of what? I'm sorry, a member of Cresthill. So we have... The LLC. Of the LLC, that's correct. Member of the LLC. So both the member sign and the manager sign. But we also have this scheme that we detail in our pleadings where Duba creates the Red Trust, which I assume is Roger Duba's trust, but the Red Trust with his son as the... essentially being involved in it. And we have the Division Gaylord LLC being the sole member of that Red Trust. Again, Duba's son is in charge of that. And Division Gaylord LLC buys the mortgage that's on this property and starts two foreclosure actions, doesn't file any list tenants notices, doesn't pursue the foreclosure actions, dismisses the foreclosure action so that a couple of days later or a couple of weeks later, Duba can record a lien on the property. Then there's a deed in lieu of foreclosure to part of the property. Counsel, that's two minutes. Thank you. So we have this series of transactions that just looks horrible. What kind of situation do you have where Duba's family members are buying the mortgage on the property and then foreclosing and not foreclosing, not naming Conrad who's got a lien on the property in the foreclosure actions, not recording list tenants notices, dismissing the foreclosure so that Duba can record a lien on the property. Those are the kinds of actions that essentially are unclean hands. Not equitable. We have a situation, and that was the other factor here, this question of what is equitable. Is there a right to set off or not a right to set off? Well, first under the statute where they're trying to say you shouldn't be able to collect this $208,000 because you got an improper commission a while ago. The law says there is no private cause of action there. But in addition we have this conduct where in every respect Duba's trying to avoid this obligation. Preston does not record the contract against the property which it agreed to record when it got under 60 acres. We've got this scheme back and forth with foreclosures playing with the property. And it's more than sufficient under the standards applicable to the credibility dispute. When Judge Anderson went out, as you say, Justice Carter, and made specific findings, Duba was not credible. Conrad was credible. And then we have Tanaka's uncontested affidavit. For each of these reasons I would ask that the court affirm Judge Anderson's credibility. Thank you. Thank you, counsel. Counsel. Thanks. We'll move on. Thank you. Let's talk quickly about the Tanaka affidavit. I look at that affidavit because it has the same untruths that match up with Mr. Conrad's affidavit in support of partial settlement judgment. Which is there's no mention of the July 12, 2000 agreement by either men's affidavit even though it existed. That's a sworn statement. I'm trying to get summary judgment on my client early on in the case with these affidavits. So that's untrue. The fact that Mr. Konopka contends he silenced the agreement on July 14, 2000 is belied by the email string between the two of them in December of 2011. Again, objective evidence of conduct which is wholly inconsistent with anything that Mr. Konopka said to make his counterclaim. Anything Mr. Konopka said in writing on the road. Mr. Konopka didn't call Mr. Konopka even though that was a big point of support in the counterclaim case. Was he available? I'm sorry? Was Konopka available as a witness? Yes. In fact, they had him on the list. I was working with Mr. Konopka's personal account, and this is all the record you'll find in the record on view. And Mr. McConnell, or Mr. Conrad, decided they were not going to call Mr. Konopka as their last witness. Did you have him on your list? No, I didn't need him. Because you found the affidavit? Right. That he signed. And the whole point was to show... But he says things in the affidavit that aren't capable of you. To your client. At first glance, it would be easy to see that. But if you compare what Mr. Conrad submitted by affidavit with Mr. Konopka's, both being drafted by Conrad's counsel, and Conrad facilitating a meeting with my client's member during the case as it was ongoing, so Mr. Konopka could sign the affidavit, I think the court shows exactly what the point of the affidavit was. It wasn't truthful. It wasn't honest. It wasn't honest because we know about the personal agreement. Neither affidavit mentions that. Mr. Conrad goes so far as to say, oh, I didn't have a $350,000 understanding until July 14th. That's not true. It was right there, in secret, mind you, in the personal agreement between the two men, marked confidential between Mr. Conrad and Mr. Konopka as the attorney for Shafsky and Frelick that closed the deal made very clear. I think we would all agree using secrecy is an instrumental problem. That's what happened. Now, as far as Doug Duga is concerned, Mr. Duga explained very clearly that he was the trustee of the Red Trust. The trustee of the Red Trust identified the period of time in which the Red Trust became part of the Duga family's existence in that the Bush tax cuts were expiring, this was a vehicle of investment, and when the mortgage was in default and running at 18% interest, Doug Duga decided this would be a good use of the Red Trust money to buy the mortgages. Division Paylord would get the benefit of the default rate profit, number two. Mr. Duga is very clear about how, like a commercial bank, that would come in, foreclose, take possession, ask for a deficiency. Division Paylord allowed Crest Hill Land Development to operate as a business part under development, to sell property, to pay off its debt piece by piece, and going so far as to enter into the forbearance agreement that Mr. Moynihan talked about, where until August of 2014 or 15, no 18% interest running as long as the debt was settled by that time that the LLC owed to Division Paylord. The council has one minute. So to find that there was a scheme, there was manipulation between Division Paylord and Crest Hill, and Crest Hill somehow had unclogged hands, it's not going to happen by the record. The manifest way it shows you there was no scheme. If there was any failing, it's whoever the foreclosure lawyers were helping Mr. W. up, not who the judge. That's a lie. Last point. The operating agreement is very clear. For my clients. Mr. Conrad was owed $142,000. He was paid that money. The personal agreement between Konopka and Conrad did not have a specific closing date. There was no period of time by which Mr. Conrad could say, oh, all bets are off, you haven't closed yet. Mr. Conrad performed the personal agreement exactly as he said he would. He signed the agreement, he acknowledged he was giving away his interest, it went to my client, it was deposited in an escrow, along with all the other assignments, and all that was left to do was to pay Mr. Conrad. The escrow agent had been told, we're going to deem July 12, 2000 as the closing date, and the railroad wasn't quite ready to close, but the railroad said, yeah, we're going to deem it the 12th of July. So, payment was made on the 17th, and the money was disbursed to everybody. That's it. Thank you very much. The court will take this matter under advisement and render it a decision.